AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

**United States of America**

**v.**

**Brian L. Schumacher**

_____
*Defendant*

Case No. 20-mj- 1089-JJM

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

From in or about April 2016 to in or about January 2017, in the Western District of New York, and elsewhere, the defendant, BRIAN L. SCHUMACHER, did devise and intend to devise a scheme and artifice to defraud Victim 1 and Victim 2, and to obtain money and property from Victim 1 and Victim 2, by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice did transmit, and did cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds.

**All in violation of Title 18, United States Code, Section 1343.**

From in or about April 2016 to in or about January 2017, in the Western District of New York, and elsewhere, the defendant, BRIAN L. SCHUMACHER, did knowingly, willfully, and unlawfully combine, conspire, and agree with Co-conspirator 1 and Co-conspirator 2 to devise a scheme and artifice to defraud Victim 1 and Victim 2, and for obtaining money and property from Victim 1 and Victim 2 by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit, and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

**All in violation of Title 18, United States Code, Section 1349.**

This Criminal Complaint is based on these facts:
☒ Continued on the attached sheet.

_____
CLINT E. HOMER
INSPECTOR
U.S. POSTAL INSPECTION SERVICE

Sworn to before me and signed telephonically.

Date: June _29_ , 2020

City and State:  Buffalo, New York

_____
HON. JEREMIAH J. McCARTHY
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK   )
COUNTY OF ERIE        )        SS:
CITY OF BUFFALO      )

     I, Clint Homer, being duly sworn, depose and say:

    1)    I am an Inspector with the United States Postal Inspection Service (USPIS).  I have been employed as an Inspector since July of 2005.  I am currently assigned to the USPIS Domicile in Buffalo, New York.  As part of my daily duties, I investigate crimes involving the use and/or misuse of the U.S. Mails.  I also investigate crimes involving the use of the U.S. Mails and or postal products to perpetrate various frauds, in violation of Title 18, United States Code, Sections 1343 (Wire Fraud) and 1349 (Wire Fraud Conspiracy).  I have received training in the areas of mail, wire and bank fraud, and have worked on numerous cases over the last fifteen years involving violations of the aforementioned statutes.

    2)    I make this Affidavit in support of an application for a Criminal Complaint charging Brian L. Schumacher ("SCHUMACHER") with violations of Title 18, United States Code, Sections 1343 (Wire Fraud) and 1349 (Wire Fraud Conspiracy).

    3)    The statements contained in this Affidavit are based upon my investigation, records obtained from financial institutions, interviews conducted by your affiant and other law enforcement, and on my experience and training as a Postal Inspector.  Because this Affidavit is being submitted for the limited purpose of securing a Criminal Complaint, I have

not included each and every fact known to me and have set forth only the facts that I believe

are necessary to establish probable cause to believe that BRIAN SCHUMACHER committed

violations of Title 18, United States Code, Sections 1343 and 1349.


4)      As more fully set out below, the investigation has established probable cause to

believe that BRIAN SCHUMACHER has committed violations of 18 U.S.C. Sections 1343

(Wire Fraud) and 1349 (Wire Fraud Conspiracy) by knowingly and with the intent to defraud,

using, and conspiring to use, wire communications to execute a scheme or artifice to defraud

individuals out of money or property by means of materially false or fraudulent

representations or promises.

Title 18, United States Code, Section 1343 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or
for obtaining money or property by false pretenses, representations, or promises, transmits or
causes to be transmitted by means of wire, radio or television communication in interstate or
foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of
executing such scheme or artifice, shall be fined under this title, or imprisoned not more than
20 years, or both.

Title 18, United States Code, Section 1349 provides that:

Any person who attempts or conspires to commit [a violation of Title 18, United States
Code, Section 1343] shall be subject to the same penalties as those prescribed for the offense,
the commission of which was the object of the attempt or conspiracy.


5)      The facts set forth below are based upon the investigation of your affiant and

other agents involved with this investigation, involving the review of records, interviews of

witnesses, and information and reports provided.  This affidavit is intended to show that there

is probable cause to support a Criminal Complaint against BRIAN SCHUMACHER and does not purport to set forth all of your affiant's knowledge of or investigation into this matter.

## PROBABLE CAUSE

6)     The scheme involves BRIAN SCHUMACHER's use of email and financial institution funds-wiring processes, in order to defraud individuals under the pretense of an investment opportunity.  Electronically sent communications and documents containing factually false information directly misled investors into believing SCHUMACHER, who resides in Penfield, New York, and two other individuals conspiring with him, Co-conspirator 1 and Co-conspirator 2, were experienced and reputable operators of an established and secure business.  Reliance on this false information resulted in investors wiring significant funds to SCHUMACHER and Co-conspirator 1 for the purpose of earning a return on an investment in diamonds, allegedly purchased and resold by SCHUMACHER and Co-conspirator 2, through their company name, Integra Diamonds. All relevant email communications and bank wiring transactions were conducted while SCHUMACHER was in New York, while his investors were located in Massachusetts and California.

7)     In or about May 2018, pursuant to an ongoing investigation, agents from the Postal Inspection Service and Internal Revenue Service, Criminal Investigations Division began looking into the recent employment history of Co-conspirator 1, who resides in the Rochester, New York area.  Basic online searches revealed that Co-conspirator 1 had been relieved of his duties as the chief financial officer of a publicly-traded company, following evidence of his misuse of company funds.  Co-conspirator 1's employer discovered that in late

3

2015, Co-conspirator 1 had used company funds without authorization to "invest", seeking personal gain.   A portion of those funds were disbursed to a company called Integra Diamonds.

8)      A search of the New York Department of State Division of Corporations revealed that Integra Diamonds, Inc. was established on or about July 22, 2009.  The address of record for Integra Diamonds was Post Office Box 25495, Rochester, New York, 14625. The Chief Executive Officer and Principal Executive Officer was listed as BRIAN SCHUMACHER, with an address of 59 Arrowhead Lane, Penfield, New York, 14526.

9)      A copy of the PS Form 1093, *Application for Post Office Box or Caller Service*, was obtained from the Panorama Branch U.S. Post Office, which houses Post Office Box 25495 in zip code 14625.   The box was opened on July 25, 2009, by customer BRIAN SCHUMACHER, to receive mail addressed to Integra Diamonds and SR Fuel Corp.  On or about July 16, 2018, the Panorama Branch received an email from BRIAN SCHUMACHER, 25 Shadow Pines Drive, Penfield, NY, 14526, (585) 732-5782, stating, "I have an existing PO Box 25495 and would need to make sure me and my businesses are receiving mail properly. The following is a list of entities: Brian Schumacher, ESDC, Expedited Solutions, Integra Diamonds, SR Fuel Corp.  Thank you, BRIAN SCHUMACHER".

## Victim 1

10)      On or about November 8, 2019, agents conducted a telephone interview with Victim 1, of Massachusetts, in which Victim 1 described his experiences with Co-conspirator

1, BRIAN SCHUMACHER and Integra Diamonds.  Victim 1 supplemented his allegations by providing agents copies of emails, text messages and documents sent to him by Co-conspirator 1 and SCHUMACHER, enticing Victim 1 to invest with Integra Diamonds.

11)    In or about April 2016, Victim 1 was solicited for an investment opportunity involving raw diamonds by Co-conspirator 1, whom Victim 1 has known since the two attended the same high school.  Co-conspirator 1 advised Victim 1 that he had partnered with someone to purchase and resell raw diamonds for profit.

12)    On or about May 25, 2016, Co-conspirator 1 sent Victim 1 a summary of Integra Diamonds via email, describing Integra's basic business plan, including the assertion that an investment of $100,000.00 would yield Victim 1 a minimum profit of $60,000.00 in one year.  This profit was based upon a return of 2.5 to 5.0% ($2,500.00 to $5,000.00), up to two times, or "turns", per month.  In a later email, Co-conspirator 1 included an attachment titled "Executive Summary", a two page document formalizing Integra Diamonds' certifications and security and sales plan, among other things.

13)    On or about June 3, 2016, Co-conspirator 1 advised Victim 1 in an email that he and "Brian" would increase the promised return to Victim 1 for the proposed $100,000.00 investment to 8% ($8,000.00, up from $2,500.00 to $5,000.00) per turn.  The email included a number of attached documents, several of which listed BRIAN SCHUMACHER as President and CEO of Integra Diamonds.  One of the attachments was an instruction sheet for wiring funds to Integra Diamonds' account at Merrill Lynch.

14)     Victim 1 was skeptical of Co-conspirator 1 and his presentation, as the return was quite generous, and he wanted to be assured he was not the initial or sole investor in Integra Diamonds. Co-conspirator 1 promised Victim 1 he was not the only investor, advising him that he and SCHUMACHER already had $1,000,000.00 in capital raised. In a message sent from Co-conspirator 1's email address on or about June 15, 2016, Co-conspirator 1 advised Victim 1 that he would be sending Victim 1 a copy of the Integra Diamonds bank statement showing the capital balance. Based on this representation, Victim 1 agreed to go forward with his investment in Integra Diamonds.

15)     Continuing on or about June 15, 2016, Co-conspirator 1 sent Victim 1 a message which included a number of attached documents. The documents included an executed Promissory Note and Investor Agreement which had both been signed by SCHUMACHER, as President and CEO of Integra Diamonds, dated June 14, 2016. The Promissory Note stated, among other things, that in exchange for the $100,000 from Victim 1, Integra Diamonds promised to repay Victim 1 an 8% return per year on the $100,000.00. The Investor Agreement stated the "Company shall pay the investor an 8.0% return ($100,000.00 times 8.0% = $8,000.00) on the completion of each transaction in which Integra procures and sells product to its clients (i.e. each culmination of an inventory purchase and sale). Integra guarantees a minimum of one (1) transaction a month. On occasion, there may be two (2) transactions completed in a month depending on supply conditions."

16)     Also on or about June 15, 2016, Co-conspirator 1 sent Victim 1 an email which included an attachment titled, "5.31.2016 Statement.pdf". The attachment was a one page

6

bank statement for an Orange Bank and Trust account in the name of Integra Diamonds, Inc., showing a balance of $1,000,015.00.

17)     Based upon the representations and promises made to him in the multiple email messages, on June 16, 2016, Victim 1 wire transferred $100,000.00 from his Citibank account number ending in 7114 to Integra Diamond's Merrill Lynch account number ending in 2986, as directed.

18)     SCHUMACHER was the sole signor on the Integra Diamonds Merrill Lynch account ending in 2986 when it was opened on or about April 1, 2016.  Co-conspirator 1 was added as a signor on or about June 14, 2016.  Prior to Victim 1's wire transfer, the account balance on June 16, 2106 of the Integra account was $0.00.  Between June 20, 2016 and July 15, 2016, the following summarized expenditures, as listed on the chart below, among others, were noted.

| DESCRIPTION | AMOUNT |
| --- | --- |
| Wired to personal Citizens Bank account of Co-conspirator 1[1] | $59,133.54 |
| Check paid to and cashed by SCHUMACHER | $9,500.00 |
| Wired to personal JPM Chase account of Co-conspirator 2 | $2,500.00 |
| TOTAL | $71,133.54 |

19)     On several occasions in 2016, Victim 1 communicated with Co-conspirator 1 and discussed the progress of the diamond purchase and sale, and the status of the investment repayment.   Victim 1 repeatedly requested documents confirming, for instance, that

---

[1] $44,000 of the funds that were wired to Co-conspirator 1's Citizen's Bank account were then wired to a different account, from which they were attempted to be wired to SCHUMACHER in Sierra Leone. The wire to Sierra Leone, however, was unsuccessful, and $44,500 was returned to Co-conspirator 1's Citizens Bank account.

representatives of Integra Diamonds were in fact traveling to Africa for the diamond purchase, records of any diamond purchase, and confirmation that an arrangement was in place with a buyer back in the United States.   Co-conspirator 1 provided a number of excuses for the failure of Victim 1's investment, including: SCHUMACHER was in Africa but purchases were delayed, and ITT had backed out as a buyer.  However, no documentation of any kind was provided.

20)    On August 8, 2016, Co-conspirator 1 returned $30,000.00 to Victim 1, sending an Official Bank Check drawn against Co-conspirator 1's personal Citizens Bank account, to Victim 1 in Massachusetts.  Victim 1 never received any portion of the additional $70,000.00 he had provided two months earlier, or any profits on his $100,000.00 invested with Integra Diamonds.

21)    Your affiant reviewed the two page Executive Summary of Integra Diamonds Co-conspirator 1 had provided to Victim 1.  It was broken down into a number of sections, each with its own heading.  Under the opening section, "Company Bio," it was stated that Integra Diamonds "is rated with the Jewelers Board of Trade, is a member of the Jewelers Vigilance Committee and the American Gem Society."  On February 4, 2020, your affiant confirmed with representatives of Jewelers Board of Trade, Jewelers Vigilance Committee and the American Gem Society, that Integra Diamonds was never a member or had a rating by any of the three organizations.  None of the three had any records of any interaction at any time with Integra Diamonds.

22)     Under the heading of "Risks," it was stated that, "....the secure transporting and logistics aspects in transporting high value materials are predominantly handled by specialists and Integra takes the necessary precaution by using Brinks Global Services worldwide." On February 4, 2020, your affiant confirmed with a representative in Accounts and Billing with Brinks Global Services that they did not have any records of ever having provided service to Integra Diamonds.

23)     Under the heading of "Client Base," it was stated, "Integra's client's [sic] consists of ITT Space Systems Division, a United States Defense contractor and with US Government and NASA developing various satellites.  Intel, a high technology company who produces a vast variety of chips, boards and semiconductors."

24)     On February 21, 2020, your affiant received communication from the Vice President, General Counsel for Space and Airborne Systems/L3 Harris Technologies, who confirmed he could find no record of having used Integra Diamonds as a supplier.  He further noted that ITT essentially ceased to exist as such, beginning in or about 2012, when it transitioned to being under the umbrella of Excelis, which was then purchased by Harris in June 2015—that is, approximately one year before Co-conspirator 1 sent the Executive Summary to Victim 1.

25)     On March 3, 2020, your affiant received an email from a partner in the law firm of Perkins Coie LLP, which represents Intel.  The partner stated no records or information could be located which supported the assertion that Intel ever purchased or had a contract to

purchase raw diamonds or precious metals from Integra Diamonds, BRIAN SCHUMACHER or Co-conspirator 1.

26)    As noted, on June 15, 2016, Co-conspirator 1 sent Victim 1 an email with an attachment titled, "5.31.2016 Statement.pdf". The email was in response to Victim 1's inquiry as to whether or not Co-conspirator 1 and SCHUMACHER had other investors in Integra Diamonds. The attachment was a one page copy of a statement for a business checking account at Orange Bank and Trust, in the name of Integra Diamonds, Inc., 25 Shadow Pines Dr., Penfield, NY, 14526 (SCHUMACHER's home address). The statement was dated May 31, 2016 and showed the balance of the account ending in 8782 to be $1,000,015.00. Believing this to equate to potentially 10 additional investors, on or about June 16, 2016, Victim 1 wired Integra Diamonds his $100,000.00 investment.

27)    On March 4, 2020, your affiant interviewed Investor 1, who had been identified as an individual who had wired $1,000,000.00 into the Integra Diamonds Orange Bank and Trust account in early 2016. Investor 1 reported that he had been solicited by an acquaintance to loan BRIAN SCHUMACHER "show" money, for SCHUMACHER's raw diamond business. SCHUMACHER was to pay Investor 1 $100,000.00 for every month he held Investor 1's money in his account. The deposit was solely to give SCHUMACHER and Integra Diamonds the appearance of having one million dollars available to conduct business. This was confirmed by Investor 1, as one of the provisions of the loan was that it required both SCHUMACHER's and Investor 1's signatures to release any of the funds, and Investor 1 made it clear he had no intention of ever letting that happen. After several months of not

receiving any return from SCHUMACHER, with the assistance of an attorney, Investor 1 was able to recover his initial $1,000,000.00.

28)     Victim 1 made it clear that he had relied on the information contained in the Executive Summary, the terms contained in the Investor Agreement, and the balance noted for Integra Diamonds on the Orange Bank and Trust statement (potentially representing 10 additional investors), to decide to invest with Integra Diamonds.

## Victim 2

29)     In or about May 2019, M&T Bank received a complaint related to a claim of fraud.  The complainant, Victim 2, who resides in California, alleged that he had been defrauded out of $100,000 by Integra Diamonds.  Your affiant then interviewed Victim 2

30)     In or about November 2016, Victim 2 became aware of an investment opportunity involving raw diamonds, from an acquaintance hereafter referred to as "Acquaintance 1."   Acquaintance 1 arranged a meeting in California, where Victim 2 was introduced to Co-conspirator 2.  Co-conspirator 2 told Victim 2 that he was a partner in Integra Diamonds with BRIAN SCHUMACHER, who resided in the Rochester, New York area.

31)     Co-conspirator 2 and Acquaintance 1 presented an initial deal to Victim 2, where in exchange for a $100,000.00 loan to Integra Diamonds, Victim 2 would receive a guaranteed return of 50% in 90 days (documents received from Victim 2 revealed he was

ultimately promised a return of $150,000.00 plus his $100,000.00 loan amount after 90 days). Co-conspirator 2 told Victim 2 that Integra Diamonds was in solid financial standing and needed the loan to purchase raw diamonds outside of the United States.

32)     Co-conspirator 2 told Victim 2 that Integra Diamonds was well established in the purchase and resale of raw diamonds market, they had identified diamond inventory to purchase in Nigeria, they had buyers for the diamonds lined up in the United States, and Victim 2's loan would be secured by the diamonds. Acquaintance 1 told Victim 2 that he had made similar investments in Integra Diamonds previously, and received strong returns. Finalization of the loan was conducted via email between Victim 2, Acquaintance 1, Co-conspirator 2 and SCHUMACHER.[2]

33)     Specifically, between on or about November 29, 2016 and on or about December 3, 2016, Victim 2 was in direct email communication with Acquaintance 1. Acquaintance 1 forwarded information and documents received from SCHUMACHER, with Co-conspirator 2 often carbon copied (cc'd). On November 29, Acquaintance 1 forwarded an initial Promissory Note to Victim 2, which had been sent to Acquaintance 1, with a cc to Co-conspirator 2, by SCHUMACHER. Victim 2 responded to Acquaintance 1, stating that he believed the agreement was short $100,000.00 from what he had agreed upon (purportedly in the in-person meeting with Co-conspirator 2). Acquaintance 1 responded,

---

[2] Each of the emails from SCHUMACHER referenced in this affidavit was sent by or to SCHUMACHER's email address, bschumacher@integradiamonds.com. A search of a law enforcement database shows that the domain "@integradiamonds.com" is registered to GoDaddy.com, LLC, whose servers are located in Scottsdale, Arizona. As noted, Victim 2 is a resident of California. Thus, emails between SCHUMACHER and Victim 2 constitute "wires" in "interstate commerce" for purposes of 18 U.S.C. Section 1343.

with a cc to SCHUMACHER and Co-conspirator 2, advising he would have the Note corrected. SCHUMACHER sent an updated Promissory Note to Acquaintance 1, with a cc to Co-conspirator 2, which Acquaintance 1 forwarded to Victim 2. Victim 2 immediately responded that the terms still were not correct. On December 3, SCHUMACHER sent another copy of the Promissory Note to Acquaintance 1, with a cc to Co-conspirator 2, which Acquaintance 1 forwarded to Victim 2. Victim 2 responded, "All good."

34)     In exchange for the loan, Co-conspirator 2 and SCHUMACHER executed a Promissory Note with Victim 2, dated November 29, 2016. The Promissory Note and bank wiring instructions were emailed to Victim 2 as an email attachment by SCHUMACHER. Co-conspirator 2 and Acquaintance 1 were carbon copied, or "cc'd" on the email. Following the revisions to the terms requested by Victim 2, SCHUMACHER emailed the finalized Promissory Note to Acquaintance 1, with a cc to Co-conspirator 2 on or about December 3, 2016. It was then forwarded to Victim 2 by Acquaintance 1.

35)     On December 2, 2016, Victim 2 wire transferred $100,000.00 from his JP Morgan Chase Bank account number ending in 1958 to SCHUMACHER's Integra Diamond's M&T Bank account number ending in 0516.

36)     SCHUMACHER was the sole signor on the Integra Diamonds M&T Bank account ending in 0516. The beginning account balance on December 1, 2016 was $9.00. Between December 2, 2016 and December 9, 2016, the following summarized expenditures, as listed on the chart below, among others, were noted.

13

| DESCRIPTION | AMOUNT |
|---|---|
| Withdrawn in cash | $90,000.00 |
| Check paid to SCHUMACHER and deposited to a personal account held by SCHUMACHER | $5,000.00 |
| TOTAL | $95,000.00 |

37)    Over the course of the next year, Victim 2 had ongoing email exchanges with Acquaintance 1, who was purportedly in regular contact with SCHUMACHER and Co-conspirator 2, and text exchanges with SCHUMACHER, requesting status updates and return of his funds. According to Victim 2, through Acquaintance 1 and on his own, SCHUMACHER provided a number of excuses for the failure of Victim 2's investment, including: the diamond purchase in Nigeria was simply taking longer than expected, the original diamond purchase in Nigeria fell through and SCHUMACHER was trying to secure another deal, and the buyers of the Nigerian diamonds fell through and SCHUMACHER was trying to secure a new buyer.  Ultimately, Integra Diamonds did not repay Victim 2 any portion of the $100,000.00 loan principle, or any interest.


38)    According to business records provided in response to a grand jury subpoena served on Integra Diamonds, SCHUMACHER traveled to Sierra Leone, Africa between December 12, 2016 and December 30, 2016 for the purpose of acquiring industrial grade diamonds. A review of the records, including an itemized expense report, revealed that on December 22, 2016, SCHUMACHER purchased 1,211.85 carats of industrial diamonds for $30,296.25 from La Mine Import Limited in Freetown, Sierra Leone, Africa. SCHUMACHER spent the remainder of approximately $70,000 on expenses that were

categorized as airfare, customs, fuel/mileage, goods, license & fees, lodging, meals, phone, security, taxes, and transportation.

39)    Additional records obtained by your affiant show that on or about January 27, 2017, SCHUMACHER sold 1,212 carats of industrial grade diamonds at $9.50 per carat to C.D., owner of Diamond Broker 1, located in New Jersey. C.D. issued a check payable to Integra Diamonds for $11,514.00 as payment for the diamonds.

40)    On or about January 27, 2017, SCHUMACHER deposited the $11,514.00 check from Diamond Broker 1into Integra Diamond's M&T Bank account number ending in 0516.  The beginning account balance on January 26, 2017, was $667.25.  Between January 27, 2017 and March 17, 2017, SCHUMACHER issued checks to himself totaling approximately $7,800.00 for expense reimbursement, and wire transferred $2,000.00 to Co-conspirator 2.  The remainder of the funds was spent on items such as payments to Uber, rental car, hotel, phone provider, and restaurants.  Victim 2 did not receive any proceeds from SCHUMACHER's sale of diamonds to Diamond Broker 1.

## INTERVIEW OF BRIAN SCHUMACHER

41)    On May 21, 2020, BRIAN SCHUMACHER agreed to be interviewed by your affiant.  SCHUMACHER identified himself as the founder and sole owner of Integra Diamonds.  He founded Integra Diamonds in 2009, after allegedly working for Rochester Diamonds, Inc. from approximately 2006 to 2008, and taking two classes at the Geological Institute of America in Manhattan, New York in or about 2009.  Neither experience provided

SCHUMACHER the opportunity to travel internationally to purchase or resell bulk, raw diamonds.  SCHUMACHER confirmed his long-time personal and business relationship with Co-conspirator 2, as well as his experience with Co-conspirator 1, initially as an investor in Integra Diamonds, and then as a solicitor of additional investors.

42)     SCHUMACHER's first attempt at diamond wholesaling took place in or about 2015, when he traveled to Guinea, Africa with approximately $400,000.00, which represented all of his savings, and additional funds from his parents.  Ultimately, all funds were depleted in a deal that left SCHUMACHER needing additional funding, but which did not lead to SCHUMACHER purchasing any diamonds. SCHUMACHER then begin seeking outside investors.  His friend and sometimes business partner, Co-conspirator 2, introduced him to Co-conspirator 1 and eventually, Victim 2.[3]  After losing several hundred thousand dollars (of his employer's money), Co-conspirator 1 recruited Victim 1.

43)     SCHUMACHER said he created the two page Executive Summary for Integra Diamonds and confirmed it was sent to potential investors, including Victim 1 and Victim 2, to encourage them to invest in a successfully established company.  SCHUMACHER

---

[3] Following his agreement to provide funds (misappropriated from his employer), Co-conspirator 1 required that his associates, Co-conspirator 2 and Acquaintance 2, travel with SCHUMACHER to Guinea for any prospective diamond purchase using Co-conspirator 1's investment.  According to SCHUMACHER, once in Guinea, Acquaintance 2 completely took over the negotiations and purchase of an amount of diamonds for approximately $140,000.00, under the name of Integra Diamonds.  As Acquaintance 2, Co-conspirator 2 and SCHUMACHER were traveling back to the United States, the diamonds were seized by French authorities in Paris.  After approximately 6 months, Acquaintance 2 was able to return to Paris, regain possession of the diamonds, and bring them into the United States.  Records obtained by your affiant show that in or about July 2016, Acquaintance 2 sold 3,686 carats of industrial grade diamonds at $11.39 per carat to C.D., owner of Diamond Broker 1, located in New Jersey.  C.D. wire transferred $42,000.00 to Acquaintance 2 as payment for the diamonds.  No records have been found showing Acquaintance 2 provided any portion of the $42,000.00 to SCHUMACHER or Integra Diamonds.

admitted the majority of the Executive Summary was false. Integra Diamonds was never a member or had any affiliation with the Jeweler's Board of Trade, the Jeweler's Vigilance Committee or the American Gem Society.  Integra Diamonds did not have a contract with Brinks Global Services.  Integra Diamonds never had purchase orders from, or contracts to sell diamonds to, ITT Space Systems or Intel.  When asked why he would make the misrepresentations contained in the Executive Summary, SCHUMACHER said that he felt the Executive Summary needed to appear professional and impressive in order to entice people to invest.

44)    SCHUMACHER admitted the $1,000,000.00 in the Orange Bank and Trust account was not an actual investment in Integra Diamonds, but rather, just an attempt to appear that Integra Diamonds had that much capital available for diamond investing. SCHUMACHER confirmed the money could not actually be accessed or used by him or Integra Diamonds, but that information was never provided to potential investors.

45)    SCHUMACHER conceded that none of the funds received from Victim 1 were used to fund a diamond purchase; he had used some of the money to travel to Sierra Leone, Africa, but had not actually made a purchase.  Co-conspirator 1, who had solicited Victim 1, used some of the money to open a day trading account, and to purchase some electronics parts in Canada for resale, but both investments had resulted in failures.  Once SCHUMACHER was in Sierra Leone, SCHUMACHER attempted to receive $50,000 of Victim 1's investment via wire transaction for expenses and diamond purchases, but the wire

would not go through.[4] SCHUMACHER admitted that no diamonds were purchased with Victim 1's money, and that while Victim 1 received $30,000 of his $100,000 investment, he did not receive the rest of his principal, nor did he receive any promised return.

46)     SCHUMACHER stated that the $100,000.00 received from Victim 2 was used for a second trip to Sierra Leone, resulting in the purchase of diamonds for approximately $24,000.00 (records show the purchase was actually approximately $30,000.00), which were then sold in the United States for approximately $11,000.00. SCHUMACHER also stated that he made the $90,000 cash withdrawal referenced in paragraph 36, which he hand-carried to Sierra Leone. Records received from Integra Diamonds in response to a subpoena show that the $90,000 was used for, among other things, the diamond purchase referenced above; a license to purchase diamonds; a number of expenses (such as hotels, meals, security, and a "shakedown"); as well as several smaller personal expenses in the United States. Despite the representations contained in the Executive Summary about Integra's business model, SCHUMACHER admitted to your affiant that he did not have a model for turning investor funds into profit.

47)     SCHUMACHER confirmed he had not repaid Victim 1 any part of his original $100,000.00 investment or any profits, although SCHUMACHER was aware Co-conspirator 1 had returned a portion of Victim 1's funds to him.  Victim 2 never received any portion of

---

[4] After several intervening transactions, $44,000 of the $50,000 was ultimately returned to Co-conspirator 1's personal checking account. In addition, Co-conspirator 1 used over $20,000 of Victim 1's money for investments described above. SCHUMACHER confirmed to your affiant that Victim 1 was not aware that his investment was used for things other than diamond purchases. SCHUMACHER also told your affiant that Co-conspirator 1 essentially took control of things.

his original $100,000.00 investment or any profits, despite the fact SCHUMACHER had used Victim 2's funds to travel to Sierra Leone and make a diamond purchase, which he later sold in the U.S. for a loss. SCHUMACHER admitted that he never paid Investor 1 any portion of the $100,000.00 per month for the use of his $1,000,000.00 in the Orange Bank and Trust account as promised.

## CONCLUSION

48)    As illustrated in this affidavit, there is probable cause to believe that, beginning in or about April 2016, and continuing until in or about January 2017, BRIAN SCHUMACHER, Co-conspirator 1 and Co-conspirator 2 conspired to, and did in fact, defraud investors out of hundreds of thousands of dollars.

49)    SCHUMACHER, Co-conspirator 1 and Co-conspirator 2 provided misleading information as well as the documents and wiring instructions necessary to secure $100,000.00 each from Victim 1 and Victim 2.  Most communications were conducted by email, with many crucial documents exchanged as attachments to emails between parties.  All email communications and bank wiring transactions were conducted while SCHUMACHER was in New York, Victim 1 was in Massachusetts and Victim 2 was in California.

50)    Based upon the above information, I believe that probable cause exists to believe there have been violations of Title 18, United States Code, Sections 1343 (Wire Fraud) and 1349 (Wire Fraud Conspiracy), and respectfully request the issuance of a Criminal

Complaint charging BRIAN SCHUMACHER with violations of Title 18, United States

Code, Sections 1343 and 1349.

CLINT HOMER,
U.S. Postal Inspector
U.S. Postal Inspection Service

Sworn and subscribed to before

me, telephonically, this 29th day of June, 2020.

HONORABLE Jeremiah J. McCarthy
United States Magistrate Judge

20